# CIRCUIT COURT OF FAIRFAX COUNTY

In re Estate of
James L. Hillman

## Case No. (Fiduciary) 48140

■■■■

BY JUDGE JANE MARUM ROUSH

## September 8, 1994

This case comes before the court on the exceptions of Allstate Financial Corporation ("AFC") to the Commissioner's Report of Debts and Demands for the Estate of James L. Hillman. The Court heard oral argument, received memoranda, and took the case under advisement. For the reasons set out below, the Court finds that the estate of Mr. Hillman is liable pursuant to the guaranty made by the partnership of which he was a general partner for advances made under the guaranteed obligations until the date of his death. The estate is not liable for post-death advances. The estate is entitled to a credit for post-death collections on the guaranteed amount outstanding as of the date of death. The case will be returned to the Commissioner of Accounts to take additional evidence as to the amount of the debt existing on the date of death and any credits for payments and recoveries made on that amount after the date of death.

The issue in this case is the extent of the liability of the estate of a general partner under a guaranty made by his partnership when the guaranteed obligations are not in default on the date of death and additional amounts are incurred on the guaranteed obligations after the date of death.

The facts of this case may be briefly summarized. James Hillman ("Mr. Hillman" or the "decedent") and Menkem Onyia were the sole partners of MOJLH Associates, a District of Columbia general partnership ("MOJLH"). Mr. Hillman and Mr. Onyia also were principals of an affiliated company, Tri-Continental Industries, Incorporated ("Tri-Con"). Tri-Con operated as a fuel

oil supplier and delivery service. MOJLH owned a fuel depot in the District of Columbia that it leased to Tri-Con.

In January of 1990, Tri-Con entered into a factoring agreement with AFC. Under the agreement, AFC purchased Tri-Con's accounts receivable at 80% of their face value. The factoring agreement provided for Tri-Con to receive a portion of any payments received by AFC on those accounts receivable in excess of the 80% purchase price. AFC also issued three letters of credit to Tri-Con's wholesale suppliers for Tri-Con's benefit. All three letters of credit eventually were drawn upon by the suppliers due to Tri-Con's nonpayment.

MOJLH guaranteed Tri-Con's various obligations to AFC pursuant to a guaranty dated January 9, 1990. MOJLH's obligations to AFC under the guaranty were secured by an indemnity deed of trust to certain real property owned by MOJLH. Finally, Tri-Con, MOJLH, and Mr. Onyia (but not Mr. Hillman) executed a confessed judgment promissory note payable to AFC further to secure Tri-Con's performance.

Mr. Hillman died in April of 1991. Under both the District of Columbia Code and MOJLH's partnership agreement, Mr. Hillman's death triggered dissolution of the partnership. D.C. Code Ann. § 41-130 (1981); General Partnership Agreement of MOJLH, ¶¶ 8.5, 8.6. At the time of Mr. Hillman's death, neither Tri-Con nor MOJLH was in default of their various obligations to AFC, although there was an outstanding balance on the Tri-Con/AFC factoring agreement guaranteed by MOJLH. After Mr. Hillman's death, Mr. Onyia (the sole remaining partner of MOJLH) did not wind up the affairs of the partnership nor create a limited partnership as required by the terms of MOJLH's partnership agreement. Instead, he continued to operate the business of MOJLH without notifying AFC of Mr. Hillman's death.

Subsequently, many of the accounts receivable sold to AFC were not paid, and a large debt accumulated due to drawing of the letters of credit by Tri-Con's suppliers. Tri-Con defaulted on its obligations to AFC and filed for bankruptcy protection in November of 1992. In March of 1993, AFC obtained a confessed judgment against MOJLH and Mr. Onyia individually. AFC has since foreclosed on the indemnity deed of trust and other collateral AFC held for Tri-Con's obligations. Nevertheless, a large deficiency remains. As of March 15, 1993, AFC was owed approximately $940,000.00 by MOJLH pursuant to its guaranty. AFC has made a claim for the full amount of that debt against the estate of Mr. Hillman.

After the "debts and demands" hearing held on June 8, 1993, the Commissioner of Accounts ruled that Mr. Hillman's estate was not liable for that portion of MOJLH's debts attributable to advances under the factoring agreement made after the date of Mr. Hillman's death. The Commissioner

found that AFC had not proven what portion of the debt was incurred during Mr. Hillman's lifetime and therefore disallowed any claim by AFC.

AFC contends that the estate of Mr. Hillman is liable for the entire guaranteed obligation, whether incurred before or after Mr. Hillman's death, "because the Guaranty and Deed of Trust represented continuing obligations of MOJLH and, during MOJLH's protracted dissolution/winding up, Tri-Con continued to obtain sizable advances from AFC pursuant to the Factoring Agreement and the related Guaranty and Deed of Trust." Statement of Exceptions of AFC at 6. The estate responds that its liability is limited to partnership obligations existing at the time of Mr. Hillman's death. The estate argues that because none of MOJLH's obligations to AFC was in default at the time of Mr. Hillman's death, no obligation existed as of the date of death for which Mr. Hillman's estate is liable.

Under Virginia law, the report of a Commissioner in Chancery is not accorded the deference due a jury verdict but "should be sustained unless the trial court concludes that the commissioner's findings are not supported by the evidence." *Morris v. United Virginia Bank*, 237 Va. 331, 337 (1989) (emphasis omitted). Although this standard "applies with particular force to a commissioner's findings of fact … [it] is not applicable to pure conclusions of law … ." *Id.* (citations omitted). The dispute in the instant case turns on issues of law, and therefore, it is subject to independent review by the Court.

As noted above, MOJLH is or was a District of Columbia partnership. Under District of Columbia partnership law, a partner is jointly liable for "all debts and obligations of the partnership." D.C. Code Ann. § 41-114. The death of a partner causes the dissolution of a general partnership. D.C. Code Ann. § 41-130. Further, "the dissolution of a partnership does not of itself discharge the existing liability of any partner," D.C. Code Ann. § 41-135(a), and "the individual property of a deceased partner shall be liable for all obligations incurred while he was a partner but subject to the prior payments of his separate debts." D.C. Code Ann. § 41-135(d).

Both parties agree that the estate has a liability for any obligations incurred under the MOJLH/AFC guaranty prior to Mr. Hillman's death. The parties do not agree as to the meaning of the phrase "obligations" as applied to the guaranty.

AFC contends the guaranty itself was an "obligation" existing as to the date of Mr. Hillman's death. Therefore, AFC argues, any amount advanced to Tri-Con, both before and after Mr. Hillman's death, is encompassed within the scope of the guaranty and is an obligation of MOJLH's existing on the date of death for which Mr. Hillman's estate remains liable.

The estate argues that "obligation" means an obligation presently due and owing.[1] Because the guaranteed obligations were not in default on the date of death, the estate contends, no amount was due and owing as of the date of death, and, therefore, no "obligation" existed on the date of death.

I conclude that an "obligation" of a partnership for which its partners are jointly liable under District of Columbia partnership law includes obligations that have been contracted for by the partnership but which are contingent, unliquidated, or unmatured as of the date of the partner's death. The term "obligation" as used in D.C. Code § 41-135(d) is not limited to obligations that are due, owing, and payable as of the death of the general partner. Accordingly, Mr. Hillman's estate does not escape liability for amounts owed pursuant to MOJLH's guaranty because that guaranty was contingent as of the date of Mr. Hillman's death. Conversely, the estate is not liable for all amounts due under the guaranty, including those amounts incurred after his death, simply because the guaranty was executed by MOJLH during his lifetime. Section 41-135(d) of the District of Columbia Code makes clear that a partner is only liable for obligations "incurred while he was a partner." Mr. Hillman ceased being a partner of MOJLH on the date of his death. Under District of Columbia law, Mr. Onyia, as a partner continuing the business of the partnership after its dissolution, may be personally liable for advances made under the guaranteed obligations after Mr. Hillman's death. D.C. Code Ann. § 41-140. Similarly, MOJLH is liable for its post-dissolution transactions. D.C. Code Ann. § 41-134. But Mr. Hillman's liability as a general partner for the obligations of his partnership under D.C. Code Ann. § 41-114(2) was terminated as of the date of his death. D.C. Code Ann. § 41-135(d).

The distinction between the continuing obligation of a *partnership* as opposed to a deceased *partner* for post-dissolution transactions of the partnership is discussed by Professor Bromberg, described by AFC as the "foremost authority on partnership law." Statement of Exceptions at 7. In his treatise on partnership law, Professor Bromberg comments that:

> Dissolution per se has no effect on existing liabilities of the *partners*. This is true whether the business is liquidated or continued by some of the partners. In the latter situation, obligations incurred before dissolution remain binding on both the continuing and retiring partners. Dissolution itself also does not discharge the liability of the *partnership*, for the partnership continues through the period of winding up … .

---

[1] It does not appear that the estate advanced this argument to the Commissioner of Accounts.

A. Bromberg & L. Ribstein, *Bromberg and Ribstein on Partnership* § 7.14 (1993) (emphasis in original). *See also, Lenkin v. Beckman,* 575 A.2d 273 (D.C. App. 1990) (distinguishing the liability of a partnership from that of its partners for a dissolved partnership's debts).

Pursuant to Va. Code Ann. § 26-33, this matter will be remanded to the Commissioner to reopen the debts and demands hearing for the sole purpose of determining the amount of advances and other sums owed by Tri-Con to AFC under the factoring agreement as of the date of death of Mr. Hillman and any credits due on that amount based on post-death payments or collections, all in accordance with the factoring agreement and the guaranty.

September 19, 1996

This case came before the Court on May 30, 1996, for a hearing on the exceptions of the Hillman Estate and Allstate Financial Corporation, a creditor of the Estate, to the Commissioner of Accounts' Report on Remand, dated March 7, 1996 (the "Commissioner's Report"). At the conclusion of the hearing. The Court took the matter under advisement. The Court has now had the opportunity fully to consider the Commissioner's Report, the briefs submitted by counsel, and the arguments of counsel. The ruling on each of the exceptions is set forth below.

*Facts*

The facts of this case prior to remand were summarized in the opinion letter of the Court dated September 8, 1994, and will not be repeated here.[2] In that opinion letter and in the order that was entered pursuant thereto, the Court ruled that the Hillman estate is liable pursuant to a guaranty made by MOJLH, a District of Columbia partnership of which Mr. Hillman was a general partner, for advances made under the guaranteed obligations until the date of Mr. Hillman's death. The estate was held not to be responsible for post-death advances on the guaranteed obligations. The estate was held to be entitled to a credit for post-death collections on the guaranteed amount outstanding as of the date of death. The matter was remanded to the Commissioner to take additional evidence as to the amount of the guaranteed debt under a certain

---

[2] Any capitalized term not defined herein will have the meaning given to it in the September 8, 1994, opinion letter of the Court.

factoring agreement existing on the date of death and any credits for payments and recoveries made on that amount after the date of death.

On remand, a limited "debts and demands" hearing was held on January 25, 1995. The Commissioner granted both sides the opportunity to file post-hearing briefs on the issues of the sufficiency of the evidence presented at the hearing and the application of post-death collections. The parties misconstrued that invitation as license to take additional discovery which they then submitted to the Commissioner as additional evidence in March, 1995. In his report, the Commissioner noted parenthetically that:

> None of the "evidence" from the March 1, 1995, deposition was presented to the Commissioner except as addenda to briefs filed by counsel. There being no objection, the Commissioner has reviewed the information so provided in drafting this report. However, the testimony and documents produced at the deposition do not appear to be formally in evidence.

Commissioner's Report, p. 3.

The Commissioner determined that "with respect to the advances made pursuant to the Factoring Agreement on schedules of accounts receivable invoices outstanding as of April 14, 1991 [Date of Death], the sum of $162,486.93 remained unpaid after application of payments received after April 14, 1991." Commissioner's Report on Remand, p. 2. The Commissioner allowed AFC's claim in that amount, subject to further credits. The Commissioner found that AFC was entitled to an additional claim in the amount of $5,461.96 for discounts earned under the factoring agreement. The Commissioner found that AFC was entitled to interest on its claims from the date of death until paid at the judgment rate.

The Commissioner determined that the Estate was entitled to a credit against AFC's claim for the net proceeds of the sale of vehicles owned by Tri-Con sold by AFC pursuant to AFC's enforcement of its security interest in the vehicles. The amount of the net proceeds was $139,367.39 (the gross proceeds), less the "reasonable expenses of sale, including attorney's fees." Commissioner's Report on Remand, p. 11.[3]

The Commissioner ruled that, as to Tri-Con's obligations under certain irrevocable letters of credit, AFC failed to establish the "amount, if any, [that] may have been owed by Tri-Con to its suppliers as of the date of death and

---

[3] Apparently, no evidence was presented to the Commissioner of the costs of the sale of the vehicles.

which remained unpaid by Tri-Con after the date of death so as to require payment by AFC under the letters of credit." Commissioner's Report on Remand, pp. 7-8 (emphasis in original). Accordingly, the Commissioner found that AFC has "failed to carry [its] burden with respect to transactions under the letters of credit" and denied AFC any claim related to the letters of credit. *Id.* at pp. 8-9.

The Commissioner found that the costs of the proceedings before the Commissioner of $1,437.50 are properly an expense of administration which should be paid by the estate.

Both the estate and AFC filed exceptions to the Commissioner's Report on Remand.

### Estate's Exceptions

1. The estate excepts to the Commissioner's Report on Remand on the basis that the Commissioner's allowance of AFC's claim against the estate in the amount of $162,486.93 is unsupported by the evidence. The estate claims that an exhibit introduced by AFC at the initial debts and demands hearing on June 8, 1993, showed that "cash collected" by AFC after Mr. Hillman's death was $3,832,704.40. This exhibit also showed a balance due to AFC on April 30, 1991, two weeks after Hillman's death, of only $1,207,977.02. The estate argues that the full amount of post-death collections should be credited to the obligations of Tri-Con. Accordingly, the estate asserts that the credits exceed the amount owed by over $2 million, and therefore, the estate owes AFC nothing.

This exception to the Commissioner's Report on Remand is overruled. The $3,565,145.00 was the total amount collected by AFC after Mr. Hillman's death. That included payments for advances made under the factoring agreement after Mr. Hillman's death, when the business of MOJLH and Tri-Con was continued by Mr. Hillman's partner. The estate is not entitled to credits on the obligations outstanding as of the date of death for post-death collections for post-death advances.

Under Virginia law, the report of a Commissioner in Chancery "should be sustained unless the trial court concludes that the commissioner's findings are not supported by the evidence." *Morris v. United Virginia Bank*, 237 Va. 331, 337 (1989) (emphasis omitted). This rule "applies with particular force to a commissioner's findings of fact." *Id.* In this case, the Court determines that the Commissioner's finding as to the amount due under the factoring agreement as of April 14, 1991, is supported by the evidence. For this reason, the Court overrules the estate's first exception to the Commissioner's Report.

2. The estate next excepts to the Commissioner's Report on the basis that the Commissioner erred by failing to address the estate's right to a release under § 8.9-504(3) of the Code of Virginia. Under this Code section, a debtor must be given written notice of the sale of collateral, otherwise a rebuttable presumption is created that the value of the collateral sold and the debt were equal and the guarantor's obligation is extinguished. *Woodward v. Resource Bank*, 246 Va. 481 (1993). The estate contends that no notice of the public sale of the rolling stock was given to the estate by AFC; therefore, AFC's sale was commercially unreasonable and the estate's debt to AFC is extinguished.

Virginia Code § 8.9-504(3) generally requires that, unless the goods are of the type customarily sold on a recognized market, reasonable notice must be given to the debtor of the time and place of the public sale of the collateral. If the collateral is to be disposed of at a private sale, reasonable notice must be given of the time after which the collateral will be sold.

In this case, AFC argues that it gave informal notice of the public sale of the collateral. The estate's counsel was notified on April 29, 1993, that a public sale of the collateral and the "sale should take place in the next three weeks." An affidavit of AFC's assistant chief operating officer was submitted indicating that the sales in fact took place beginning in August 1993 and continued until the final sale on January 6, 1994. This purported notice of sale in April 1993 is insufficient under Code § 8.9-504(3).[4]

Under the holding of *Woodward v. Resource Bank*, 246 Va. 481 (1993), when this notice requirement is not complied with, a rebuttable presumption is created that the debt equaled the amount received for the sale of the collateral and the debt is extinguished. *Woodward* also held, however, that "the presumption may be overcome if the secured party proves that the sale price represents the fair and reasonable value of the collateral." *Id.* at 488. The Virginia Supreme Court opined that:

> The rationale underlying this rebuttable evidentiary presumption is clear. The secured party, who has the burden of proving his right to a deficiency judgment, had acquired possession of the collateral and conducted the sale. Thus, the secured party is in the best position to present evidence of the fair market value of the collateral. Applying this rule here, we hold that a rebuttable presumption arose that the value of the collateral that [the creditor] sold equaled the amount of

---

[4] AFC does not contend that the rolling stock in question "is of a type customarily sold on a recognized market."

the debt because [the creditor] failed to give the required notice to [the debtor]. [The creditor] did not present any evidence at trial to rebut this presumption and, therefore, the indebtedness is extinguished.

*Woodward*, 246 Va. at 488.

In this case, AFC presented no evidence at the Commissioner's Hearing that the sales prices obtained approximated a fair and reasonable value for the collateral. AFC contends that the estate never raised the issue until it filed its post-hearing brief on March 8, 1995, long after the conclusion of the Commissioner's hearing on remand. AFC asks that the debts and demands hearing be reopened yet again to permit AFC to put on evidence before the Commissioner of the value of the collateral and the general commercial reasonableness of the sale.

The Court finds that AFC should have been prepared at the Commissioner's Hearing to present evidence as to the fair value of the rolling stock, inasmuch as it was seeking to assert a deficiency claim against the estate. Under the rule of *Woodward*, the Court finds that AFC has failed to meet its burden to prove that the sales price represented a fair and reasonable value for the collateral in the absence of the notice required by Code § 8.9-504(3). Hence, the debt was extinguished.

In sum, the Court sustains the estate's second exception to the Commissioner's Report.[5]

3. The estate next excepts to the Commissioner's Report because the Commissioner failed to give the estate credit for the value of the real property foreclosed upon by AFC.

At the remand hearing in January 1995, counsel for AFC represented to the Commissioner as follows:

Your honor, I will represent to you that AFC is still in the process of attempting to sell that real property.

Tr. p. 55. AFC apparently believes that it is not required to credit the obligation foreclosed upon until after the foreclosure purchaser *resells* the property. The record (again, largely submitted post-hearing) is that the real property was foreclosed upon in October 1993, well before the remand hearing. The real property was owned by MOJLH and served as security of

---

[5] Although this issue was not raised at the remand hearing, it was raised in the post-hearing briefs that the Commissioner invited and apparently considered.

MOJLH's obligations under the indemnity deed of trust. An affiliate of AFC purchased the property at the foreclosure sale for the gross sales price of $300,000.00. The record indicates that the auctioneer's expenses were $4,656.12, and the costs of recording the deed to the property were $6,600.00. No other evidence was presented as to the costs of the foreclosure, such as advertising, trustee's fees, and the like.[6]

The Court finds that the net proceeds of the foreclosure sale of the real property of MOJLH should have been credited to the debt under the guaranty as of the date of sale, October 5, 1993. It would appear that that credit would exceed the balance due under the guaranty as of the date of death as determined by the Commissioner.[7]

AFC contends that because its affiliate has not yet resold the property, the estate is not yet entitled to a credit. This argument misses the mark. The proceeds of the foreclosure sale, after the deduction for the reasonable expenses of sale, must be applied to the indebtedness secured by the property sold. Contrary to AFC's argument, the debtor need not wait until the foreclosure purchaser "fixes up" the property and resells it at a profit before the debt is to be credited with the proceeds of sale.

The Court sustains the estate's third exception to the Commissioner's Report on remand.

### AFC's Exceptions

1. AFC excepts to the Commissioner's Report on the basis that the Commissioner improperly applied the proceeds of the sale of the collateral rolling stock owned by Tri-Con to offset the award under the factoring agreement. The Commissioner found that AFC was entitled to $162,486.93 under the Factoring Agreement, but he also determined that the estate should receive a credit for the sale of the rolling stock in the amount of $139,367.39, the amount AFC realized upon the sale, less the reasonable costs of sale, which were not proven at the hearing.

---

[6] In one of its post-hearing submissions to this court, AFC submitted a declaration of its assistant chief operating officer that attempted to attribute the expenses of its affiliate in maintaining and improving the foreclosed property *after* it took title as an expense of foreclosure. Such deductions from the proceeds of the foreclosure sale are clearly inappropriate and will not be allowed.

[7] The foreclosed-upon real property is not "collateral" within the meaning of the factoring agreement. In that agreement, "collateral" is defined as property of Tri-Con, not MOJLH. Therefore, the proceeds of the real property foreclosure are not governed by ¶ 7(b) of the factoring agreement, discussed below.

AFC contends that the Commissioner erred because the factoring agreement provides in paragraph 7(b):

Allstate may apply the cash proceeds actually received from any sale or other disposition [of the Collateral] ... in such order and as to principal or interest as Allstate shall desire ... .

Exhibit 3, ¶ 7(b). Therefore, AFC contends it could apply collateral sales proceeds in any order it wanted. (AFC applied the proceeds to the post-death obligations of MOJLH and Tri-Con that the Court previously held were not properly obligations of the estate.)

In his ruling, the Commissioner relied upon *Chapman v. Commonwealth,* 66 Va. (25 Gratt.) 721 (1875), in determining that the proceeds of the sale of rolling stock should be applied to the indebtedness. *Chapman* notes in dicta that, where a debtor owes more than one obligation to a creditor and the creditor and debtor fail to make application of payment to a particular debt before the matter comes into controversy, the law will apply payment first to the older debt. In *Hall's Adm'r v. White,* 114 Va. 562, 567 (1913), it was held that "[when] there is no agreement between the parties in interest as to how [the payments] are to be applied," a court of equity will apply the credits to the creditor's most precarious debts. 114 Va. at 57.

In this case, AFC argues that it is entitled to apply the proceeds of the sale of rolling stock to the most precarious debts: those that relate to post-death advances to Tri-Con for which the estate is not liable pursuant to this Court's rulings as expressed in its September 8, 1994, opinion letter. Furthermore, AFC argues that there was an agreement between AFC and Tri-Con as to the application of proceeds of the sale of Tri-Con's collateral. The proceeds were to be applied in such order as desired by Tri-Con.

AFC's argument ignores the fact that, by its own evidence, the rolling stock was sold in ten lots beginning on August 2, 1993, and ending on January 6, 1994, long *before* this Court ruled that the estate is not liable for post-death advances to Tri-Con. Nothing in Virginia law or the factoring agreement would permit AFC to reallocate payments once made to debts made more precarious by an intervening court ruling after the controversy had been litigated.

AFC's first exception to the Commissioner's report is overruled.

2. AFC next excepts to the Commissioner's Report on the basis that the Commissioner improperly disallowed AFC's claim of $184,479.00 for payments made under certain irrevocable letters of credit. AFC contends that

it issued $600,000.00 in irrevocable letters of credit to Tri-Con before Mr. Hillman's death, although they were not drawn upon by Tri-Con's suppliers until after Mr. Hillman died. AFC asserts that these letters of credit constitute "obligations" of the partnership under the Court's opinion letter of September 8, 1994, even though they were unliquidated at the time of Hillman's death. AFC suggests that the Commissioner disallowed AFC's claim related to the letters of credit because the Commissioner found that the letters of credit were not "obligations" of the estate.

The Court finds that the Commissioner disallowed the claim for much more prosaic reasons: a simple failure of proof. The Commissioner found that AFC had failed to meet its burden of proof to establish the amount owed by Tri-Con to its suppliers as of the date of death. Commissioner's Report at p. 7-8. AFC's assistant chief operating officer testified at the remand hearing that the amount owing as of October 1991, several months *after* Mr. Hillman's death, was $400,548.72. In its post-hearing brief, AFC changed that sworn testimony and reduced the amount to $184,479.45 as of October 1991. No evidence was presented as to the amounts owing to suppliers at or near the date of death, April 14, 1991. Therefore, AFC's second exception to the Commissioner's report is overruled.

In summary, the Commissioner's finding that the Estate of James L. Hillman is liable to AFC in the amount of $162,486.93 plus $5,461.96 is sustained. Against that amount, however, must be credited the proven net proceeds of the sale of the rolling stock of Tri-Con and the foreclosure sale of the real property. It would appear that those credits would exceed the debt. Even if the debt were not thereby extinguished, the Court finds the debt is extinguished because AFC failed to give the notice of the public sale of the collateral required by Code § 8.9-504(3).